IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| JOSHUA CACHO, | § |
| | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| MONEVO, INC., d/b/a ALLIANCE ADVISORS | § |
| GROUP a Delaware Corporation | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| Defendant | § |
| | § |



6:22-cv-1998-PGB-DAB

## PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1.     The Plaintiff is JOSHUA CACHO ("Plaintiff") a natural person, resident of the Middle

District of Florida, and was present in Florida for all calls, in this case in Seminole County,

Florida.

2.     Defendant MONEVO, INC.  ("MONEVO") is a Delaware Corporation organized and

existing under the laws of California with its principal address at 169 Saxony Rd. Encitas,

California 92024, and can be served via registered agent David Edward Brooks at 169 Saxony

Rd. Encitas, California 92024.

3.     Defendant MONEVO, INC. hereinafter will be referred to as "Defendant" and/or

"MONEVO".

## JURISDICTION AND VENUE

4.      Jurisdiction.  This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

## PERSONAL JURISDICTION

5.      This Court has general personal jurisdiction over the Defendant because they have repeatedly placed calls to Florida residents, and derived revenue from Florida residents, and they sell goods and services to Florida residents, including the Plaintiff.

6.      Defendant maintains sufficient minimum contacts with this District, have purposefully availed themselves of the privilege of doing business in this District, maintain registered agents in Florida, and possess such significant and continuous presence in this District such as to be subject to the personal jurisdiction of this Court.

## VENUE

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Florida residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.

8.      This Court has venue over Defendant because the calls at issue were sent by or on behalf of the above-named Defendant to Plaintiff, a Florida resident.

## THE TELEPHONE CONSUMER PROTECTION ACT
## OF 1991, 47 U.S.C. § 227

9.      In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*.  Congress found that these calls

were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

10.    The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

11.    The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

12.    The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

13.    Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

14.    The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated there under. 47 U.S.C. § 227(c)(5).

15.    According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

16.     The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

17.     The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

18.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

19.     The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

20.     Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

4

21. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## FACTUAL ALLEGATIONS

22. Plaintiff's personal cell phone (407) 577-3881 has been registered on the National Do-Not-Call Registry for more than 31 days prior to first phone call from Defendant MONEVO.

23. Plaintiff never asked the National Do-Not-Call Registry administrator to remove him from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

24. Defendant MONEVO is a loan and cash advance broker for multiple different lending providers, as well a lead generator for multiple debt companies. *See exhibit A*

25. Defendant MONEVO operates under the aliases of "American Personal Loans" and "Alliance Advisors Group" owns and operates the websites www.monevo.com, and www.monevo.us.

26. As part of its marketing Defendant MONEVO hires and authorizes telemarketers to make unauthorized phone calls to consumers *en masse* using an automatic telephone dialing system ("ATDS") with prerecorded voice messages to solicit personal and business loan services on behalf of Defendant MONEVO.

27.     Defendant MONEVO approves of the contracts with these telemarketers.

28.     Defendant MONEVO pays the telemarketers out of bank accounts they own and control.

29.     Defendant MONEVO is well aware the telemarketers they hire to solicit on their behalf are violating the TCPA by making unauthorized phone calls to consumers using an ATDS.

30.     Defendant MONEVO has been sued multiple times prior to Plaintiff filing this lawsuit for violating multiple laws including TCPA, *Bradford v. Monevo, Inc., No. 3:2022cv00259 (S.D.CA., Feb. 02, 2022), Ewing v. Monevo, Inc., No. 3:2022cv01627 (S.D.CA., Oct. 21, 2022)* and continues their illegal behavior because violating the TCPA benefits them financially.

31.     Each and every time Defendant MONEVO coerces a consumer into getting approved for a loan through their lending network it benefits MONEVO financially.

32.     The plaintiff has been harassed with pre-recorded voice messages from telemarketers calling on behalf of Defendant MONEVO with a pre-approved script from Defendant MONEVO that states,

. " Hi, this is Lisa at American Personal Loans. Do you have a moment to speak? The purpose of my call is to let you know that you have been pre-approved for a personal loan of up to $15,000. Your money will be in your account within 24 hours. Therefore you can go ahead and start paying off your debt and fulfilling all of your financial obligations. So, would you like to take advantage of this opportunity today? Awesome, so let me connect you to my under writing officer to complete your application okay? Please wait"

33.     Plaintiff received at least eight (8) unauthorized phone calls to his personal cell phone 3881 from telemarketers calling on behalf of Defendant MONEVO using ATDS with a pre-recorded message and at least five (5) unauthorized telemarketing phone calls from Defendant MONEVO within a month ("the calls"). The calls Plaintiff received from or on behalf of

6

Defendant MONEVO solicited Plaintiff for personal loan services, and or debt elimination services.

34.     With information and belief, Plaintiff has received more phone calls from or on behalf of Defendant MONEVO within the past two years that are unknown to Plaintiff at this time and will be revealed during discovery.

35.     On September 06, 2022, Plaintiff received a phone call to his personal cell phone 3881 from a telemarketer calling on behalf of Defendant MONEVO from phone number (575) 500-3027.

36.     Plaintiff answered and there was a 3-4 second delay followed by an audible beep (indicating the call was made using an ATDS) before being connected to a telemarketer, but plaintiff only heard background noises and then telemarketer abruptly hung up on plaintiff.

37.     Plaintiff knows the "dead air" call was made from telemarketer representing MONEVO because a week later he got a call from same number from a telemarketer calling on behalf of MONEVO directly.

38.     On September 12, 2022 Plaintiff received a pre-recorded message from "Lisa at American Personal Loans" which is the message described in detail in *paragraph 32*.

39.     Plaintiff was extremely annoyed and frustrated for receiving a robocall, and advised "Lisa" who is a robot, that he was interested, for the sole purpose of identifying the company responsible for the annoyance

40.     Plaintiff was then placed on a hold queue for over a minute before an audible beep could be heard (further evidence of ATDS system) and a telemarketer got on the line and said "hello my name is Steve Martin and the purpose of my call is to help you find a personal loan offer."

41.     Steve then asked how much the Plaintiff needed or wanted in regards to loan amount.

7

42.     At which time the Plaintiff informed Steve that he wanted $20,000.

43.     Steve asked what the purpose of the loan was for.

44.     Plaintiff informed Steve it was to pay off credit card debts. This peaked the telemarketers interest as it's the Plaintiffs belief that there are two purposes of these calls, first is to try and get a loan approved through their lending network so they can receive direct commissions, second reason is to lead gather for "debt elimination" scam companies.

45.     Steve then inquired how many credit cards the debt was spread across and which banks was the debt associated with.

46.     After the Plaintiff responded with six (6) cards the call dropped.

47.     A few seconds later Plaintiff phone rang again from phone number (575) 550-3027, which is the same number that called plaintiff as described in *paragraphs 35-37*, and it was Steve again from MONEVO apologizing for dropping the call.

48.     Plaintiff was annoyed and told him he was busy and not interested and promptly hung up the phone.

49.     Two (2) minutes later Plaintiff received another call from "Steve" at phone number (864) 977-3312 (all calls are spoofed numbers and not available for call back) and plaintiff immediately told "Steve" to stop calling him and hung up again.

50.     September 12, 2022 Plaintiff received another "Lisa from American Personal Loans" pre-recorded call.

51.     After Plaintiff told robot he was interested (for sole purpose of identifying responsible parties) he was transferred to "James Martin" who stated " the purpose of my call is to find you a loan with suitable interest rate, or I can eliminate all of your debts, so do you want loan or do you want to eliminate your debt?"

8

52.     Line dropped shortly after to which a few seconds later "James" called back apologizing for call dropping to which Plaintiff told him out of annoyance once again to stop calling him.

53.     Plaintiff then received six (6) more calls all with same pre-recorded message "Lisa from American personal loans", and on sixth (6th) call Plaintiff informed "Lisa" he was interested, again for the sole purpose of identifying the partie(s) responsible for this continued annoyance.

54.     This time Plaintiff was transferred to Defendant MONEVO and spoke to their telemarketer by the name of "Karen" representing the "Alliance Advisors Group" and who gathered all of Plaintiffs personal, credit, and employment information.

55.     Karen informed Plaintiff "we will be sending you the information on your email address and once you access the link you will be instructed to enter in additional information accept all disclosures and consent and click on submit"

56.     Karen then provided Plaintiff with a call back number of 1 (844) 898-0544. Karen then explained that Plaintiff would be transferred to her "senior advisor" to go over more details.

57.     Karen informed Plaintiff that he would receive low interest offers from 1 of their "95 lenders".

58.     Karen was unsuccessful in transferring call to said "senior advisor" and thus asked if she could call Plaintiff back in five to ten minutes.

59.     Plaintiff received a follow up call from Karen on behalf of MONEVO from phone number (614) 954-3821. Karen transferred Plaintiff to her "senior advisor", "Alex Davis" who right away began asking bout Plaintiff's current loans that were associated with his name.

60.     Alex Davis then gathered more personal information and inquired about Plaintiffs current credit standing.

61.     Alex started speaking a foreign language which seemed Arabic in nature (which shows

the unlikely hood of his name being Alex Davis) very loudly into the phone by mistake, that Plaintiff assumes was directed to one of his co-workers. Defendant MONEVO instructs their employees and telemarketers to use aliases for both companies and themselves to disguise the true identify of all parties involved for the sole purpose of ducking liability for violating the TCPA.

62.     After placing Plaintiff on hold for several minutes Alex got back on the line and informed Plaintiff he pulled his credit report and started informing Plaintiff of the credit cards on his report and also his credit score.

63.     At no point did Alex or any other representative of Defendant MONEVO request the authorization to pull Plaintiffs credit report or did they ever ask for his social security number before pulling his credit report.

64.     Plaintiff asked Alex how he was able to gather this information and Alex's response was "well sir we are working with three credit bureau agencies and we know how to get you this loan, we have all your information and know everything about you."

65.     After this Plaintiff was once again transferred to another "senior advisor" by the name of "Dennis Briggs" who once again gathered more personal information from Plaintiff .

66.     Dennis went over credit approval questions and sent a link to Plaintiff.

67.     Plaintiff then received a loan application link from dennisaagr@gmail.com, *see exhibit B.*

68.     After opening link Plaintiff learned the company responsible for these calls was Defendant MONEVO. *See exhibit B*

69.     Plaintiff decided to go through with process to see if any other companie(s) were associated with these calls. Plaintiff filled out form and clicked submit and then was sent to a page that informed him he was not approved.

70.     A few minutes later Dennis called back from phone number (888) 325-0151 and informed Plaintiff that they had another program called debt settlement in which they could eliminate his debt and asked if Plaintiff was interested. Further proving Plaintiff's theory that the Defendant MONEVO has multiple purposes of their telemarketing calls and practices.

71.     Each and every phone call Plaintiff received from or on behalf of Defendant MONEVO is a telephone solicitation as defined by 47 U.S.C. § 227(a)(4) and solicited a personal loan to Plaintiff on behalf of Defendant MONEVO.

72.     Plaintiff did not ask Defendant MONEVO to call him regarding personal loan services.

73.     Plaintiff did not seek or solicit Defendant MONEVO phone calls or services in any way.

74.     Table A displays the calls made to Plaintiff from or on behalf of the Defendant MONEVO:

Table A

| Number | Date | Time | Caller ID | Notes |
|--------|------|------|-----------|-------|
| 1 | 09/06/2022 | 4:16 PM | (575) 500-3027 | Dead air ATDS call (audible beep and pause before getting connected) |
| 2 | 09/12/2022 | 2:14 PM | (610) 709-8624 | Lisa American personal loans robocall |
| 3 | 09/12/2022 | 2:17 PM | (575) 500-3027 | Telemarketer from American personal loans |
| 4 | 09/12/2022 | 2:18 PM | (740) 453-7840 | Telemarketer from American personal loans |
| 5 | 09/12/2022 | 2:44 PM | (605) 642-3639 | Lisa American personal loans robocall |
| 6 | 09/12/2022 | 2:46 PM | (864) 977-331 | Telemarketer from American personal loans |
| 7 | 09/20/2022 | 2:26 PM | (802) 888-9492 | Lisa American personal loans robocall |

| 8 | 09/20/2022 | 7:14 PM | (740) 342-7379 | Lisa American personal loans robocall |
|---|---|---|---|---|
| 9 | 09/21/2022 | 2:35 PM | (806)621-8341 | Lisa American personal loans robocall |
| 10 | 09/21/2022 | 7:10 PM | (740) 619-0979 | Lisa American personal loans robocall |
| 11 | 09/22/2022 | 11:12 AM | (628) 667-9673 | Lisa American personal loans robocall |
| 12 | 09/22/2022 | 6:21 PM | (605) 867-2418 | Lisa American personal loans robocall |
| 13 | 09/22/2022 | 6:38 PM | (614) 954-3821 | Call back authorized by Plaintiff |
| 14 | 09/22/2022 | 7:06 PM | (888)325-0151 | Telemarketer called back to pitch debt settlement services |

75.   Defendant's telemarketers initiated numerous unsolicited telephone calls and made unlawful telemarketing sales pitches to Plaintiff regarding personal loan and debt relief services on behalf of Defendant MONEVO.

76.   No emergency necessitated any of the alleged phone calls.

77.   Plaintiff sent an internal do-not-call policy request to Defendant MONEVO to supportusa@monevo.com on October 22, 2022, which is an email listed in the "privacy policy" on the website MONEVO owns and controls www.monevo.us.

78.   Upon information and belief, the Defendant did not have a written do-not-call policy while they were sending Plaintiff the calls.

79.   So Upon information and belief, the Defendant did not train their agents who engaged in telemarketing on the existence and use of any do-not-call list.

80.   Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3)(requiring telemarketers to honor and record DNC requests when made).

81.     Plaintiff has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity, and inability to use phone for other personal use.

## VICARIOUS LIABILITY OF DEFENDANT MONEVO

82.     Defendant is vicariously liable for the telemarketing calls that generated the lead on it's behalf.

83.     The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

84.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

85.     The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

86.     The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its
> telemarketing activities to unsupervised third parties would leave
> consumers in many cases without an effective remedy for telemarketing
> intrusions. This would particularly be so if the telemarketers were
> judgment proof, unidentifiable, or located outside the United States, as is
> often the case. Even where third-party telemarketers are identifiable,
> solvent, and amenable to judgment limiting liability to the telemarketer

> that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC,* 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted)

(alteration marks and internal quotation marks omitted).

87. More specifically, *Dish* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

88. The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

89. To the contrary, the FCC—armed with extensive data about robocalls and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

90. Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

91. Defendant is legally responsible for ensuring that the affiliates that make telemarketing calls on its behalf comply with the TCPA when so doing.

92. Defendant knowingly and actively accepted business that originated through illegal telemarketing.

14

93.     Defendant knew (or reasonably should have known) that its telemarketer were violating the TCPA on their behalf but failed to take effective steps within their power to force the telemarketer to cease that conduct.

94.     By hiring a company to make calls on their behalf, Defendant "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

95.     Moreover, Defendant maintained interim control over the actions of their telemarketers.

96.     For example, Defendant had absolute control over whether, and under what circumstances, they would accept a customer from their telemarketers.

97.     Furthermore, Defendant had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS to contact potential customers of Defendant and the ability to require them to respect the National Do Not Call Registry.

98.     Defendant also gave interim instructions to their telemarketers by providing lead-qualifying instructions and lead volume limits.

99.     Defendant donned their telemarketers with apparent authority to make the calls at issue. Thus, the telemarketers pitched personal loan services and debt relief services in the abstract.

100.    Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

101.    "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

15

102.    A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

103.    Defendant's telemarketers transferred customer information, including Plaintiff's contact information, directly to Defendant MONEVO. Thus, the telemarketer had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

104.    Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

105.    Defendant is the liable party as the direct beneficiary of the illegal telemarketing as they stood to gain Plaintiff as a customer when telemarketers solicited Plaintiff for a personal loan or debt relief services on their behalf.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

106.    Defendant's calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

107.    Defendant's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's

rights and interests in Plaintiff's cellular telephone.

108.    Defendant's calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

109.    Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to:
reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and
more frequent charging of my cell phone.

### Plaintiff's cell phone is a residential number

110.    The calls were to Plaintiff's cellular phone 3881 which is Plaintiff's personal cell phone
that he uses for personal, family, and household use. Plaintiff also uses his cell phone for
navigation purposes, sending and receiving emails, timing food when cooking, and sending and
receiving text messages. Plaintiff further has his cell phone registered in his personal name, pays
the cell phone from his personal accounts, and the phone is not primarily used for any business
purpose.

### CAUSES OF ACTION:

### COUNT ONE:
### Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing
### Without Prior Express Written Consent

111.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the
preceding paragraphs.

112.    Defendant and/or their affiliates or agents violated the TCPA, 47 U.S.C. §
227(b)(1)(A)(iii), at least thirteen (13) times by placing non-emergency telemarketing calls to
Plaintiff's cellular telephone number using an automatic telephone dialing system without prior
express written consent.

17

113.    Plaintiff was statutorily damaged at least thirteen (13) times under 47 U.S.C. §

227(b)(3)(B) by Defendant by the telephone calls described above, in the amount of $500.00 per

call.

114.    Plaintiff was further statutorily damaged because Defendant willfully or knowingly

violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount

to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing

violation.

115.    Plaintiff is also entitled to and does seek an injunction prohibiting Defendant and their

affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-

emergency telemarketing calls to any cellular telephone number using an ATDS without prior

express written consent.

## COUNT TWO:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

116.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the

preceding paragraphs.

117.    Defendant called Plaintiff's private residential telephone number which was successfully

registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls

for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47

C.F.R. § 64.1200(c)(2).

118.    Plaintiff was statutorily damaged at least thirteen (13) times under 47 U.S.C. § 227(c)(3)(F) by Defendant by the telemarketing calls described above, in the amount of $500.00 per call.

119.    Plaintiff was further statutorily damaged because Defendant willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

120.    Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## COUNT THREE:
### Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)

121.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

122.    The foregoing acts and omissions of Defendant and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking the following:

     a.    A written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1)[2];

     b.    Training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[3]; and,

---

[2]*Seeid.* at 425 (codifying a June 26, 2003 FCC order).
[3]*Seeid.* at 425 (codifying a June 26, 2003 FCC order).

      c.  In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

122.  Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

124.  Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joshua Cacho prays for judgment against the Defendant severally as follows:

A.  Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.  A declaration that actions complained of herein by Defendant violate the TCPA law;

C.  An award of $1500 per call in statutory damages arising from the TCPA §227(b) intentional violations jointly and severally against the corporation for 13 calls.

D.  An award of $1500 per call in statutory damages arising from the TCPA §227(c) intentional violations jointly and severally against the corporations for 13 calls.

E.  An award to Plaintiff of damages, as allowed by law under the TCPA;

F.  An award to Plaintiff of interest, costs and attorneys' fees, as allowed by law and equity.

G.  Such further relief as the Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

---

[4] *Seeid.* at 425 (codifying a June 26, 2003 FCC order

October 31, 2022,                               Respectfully submitted,

                                                Joshua Cacho
                                                Plaintiff, Pro Se
                                                164 Estella Road
                                                Lake Mary, Florida 32746
                                                407-577-3881
                                                Bostonreds.85@gmail.com